So we're going to hear argument first in case number 24-2803, City of Hialeah Employees v. Peloton Interactive. Ms. Fish. Good morning, Your Honors, and Judge Newman, who I see on my video. My name is Karen Fish. I'm from the law firm of Grant & Eisenhoffer. And while the caption of the case is City of Hialeah, my client in this case is Robico, which is an investment fund headquartered in the Netherlands who was appointed lead plaintiff in this class action. This is my first time back in a courtroom since COVID. So I hope you will forgive me if I'm a little rusty, but I am actually quite pleased to be back here for the first time to present argument regarding a complaint that I am quite sure is well-pled and should be sustained. In preparing for the argument, I read a lot of cases where this circuit has reversed the findings of a district court, and I found that the primary reason for reversal is that the district court misinterpreted or misapplied the pleading standard. In cases which are all cited in our briefs, like Teladoc, Celestica, Textron, and Blanford, which was written by Judge Chin, the underpinning of the court's decisions was that the district court just misapplied the standard. Or in the words of the Textron court, the district court required plaintiffs to show that their reading of the statements at issue was superior to the court's own benign reading. And this is clear error. In Blanford, Judge Chin, you wrote about a case involving inventory levels at Green Mountain Coffee. You wrote that Green Mountain's explanation of the reasons for an inventory spike and subsequent revenue gap, which is exactly what we are dealing with in this case, is entitled to little weight at this stage of the litigation. And you cited to the Keyspan case, also from this circuit, and in the Textron case, another case about inventory levels, this court cited to Blanford for the proposition that defendants... And what were the specific statements here about inventory that were misleading and that weren't puffery or statements of optimism? In terms of the statements, I can focus on two sets of statements for illustrative purposes. One set of statements addressed demand, and one set addressed inventory. Statements one, two, and three, as they are delineated in our complaint, addressed demand. And in response to analysts' questions about demand, defendant Foley says, we are not seeing softening in demand. That is absolutely not what is happening here. We are seeing robust demand. And first, I would note that... So the district court said that those statements were forward-looking? Yes, and I believe... Were they forward-looking? I don't think that there's any possible argument that these statements were forward-looking. And I'll read them to you again. We are not seeing any softening in demand. We're not seeing softening of demand. We're seeing incredibly strong organic demand. And the statement is on February 4th, 2021 call, right? Yes. Now, I mean, even if we credit the allegations of the complaint, it seems like all of the confidential witnesses you cite talk about the downturn of demand happening after the beginning of February 2021, right? The witnesses all talk about the end of February 2021, the confidential witness one, the end of February 2021, or in March, confidential witness three, downturn started by April 2021, 12, June 2021, CW 16, March 2021. So even if we credit the allegations that there was a softening later, isn't it true that you haven't plausibly alleged that it was incorrect to say that they hadn't seen a softening demand as of February 4th, 2021? I don't believe that that's correct, Your Honor. I believe if you review the CW statements, and I'll point you to statements appearing at JA 211 to 214, there were 22 CWs start testifying that demand had in fact cratered in early 2021. And I believe that there's testimony from, again, I think it may be CW1 that the timeline of events here was that after the Christmas selling season in 2020, there was an immediate drop in demand that was reported up through the sales channels from CWs who were saying sales quotas weren't being met. So I believe that the CWs, when taken in conjunction with one another, all bring this back. Okay. But whether that's a false statement, you agree would hinge on this question as to whether you've plausibly alleged there was a softening of demand as of February 4th, 2021? Yes, absolutely. Okay. And then also in respect to that same statement, right, Woodworth is talking about how the demand is reflected in the revised revenue guidance we've given for Q3 and Q4. And in fact, the company met the revenue guidance. So is that a problem for you saying that it's a false statement about demand when in fact she refers to a revenue guidance that we think is accurate? It's not a problem for me, Your Honor. I think that the defendant's focus on the revenue guidance is a bit of a red herring. Revenue guidance and demand are not terms that are used coextensively. If demand was focused – Well, that's true. I'm just saying if they say that the demand is reflected in the revised revenue guidance, then it's an explicit tying of the question of demand to the revenue guidance. So maybe that modifies the statement is what I was suggesting. What I'm suggesting is that to the extent that they were true, if analysts asked specific questions about demand and inventory, which they absolutely did in this case, this was something that they were incredibly focused upon because of COVID, then defendants could have referred the analysts to revenue guidance and not made statements assuring the market that there was no softening in demand and that inventory levels were appropriate to meet that demand. And in fact, when investors and analysts asked the company specifically about rising inventory levels, the company said these inventory levels are rising. Well, that's a different statement. That's not the one we were just talking about. But let me ask about that, actually, because I'm curious about the following, which is the August 26, 2021 earnings call, right? So that's when Peloton did the reduction in price on the bike? Yes. So it's true that you have these allegations from CW1 that that was due to excess inventory, right? Yes. Okay. So if we credit that, then maybe that is the reason for the reduction. The statement is that the price drop was offensive in response to the question as to whether it's offensive or defensive. I'm just kind of puzzled as to what that exactly means. So is this what it means? So if the question is, was the price drop offensive or defensive and what do you think about demand? A defensive price would be if demand is dropping and therefore we need to reduce the price to capture the same level of sales. And offensive would be if demand was reasonably stable, but we wanted to capture additional consumers. Is that what offensive and defensive would mean in this context? The way I read offensive is a way in which defendants hid the fact that they were lowering the price to get rid of excess inventory. I think it all ties into. But the question isn't about excess inventory, right? The question is, is this offensive or defensive in light of demand, right? Yes. And I think that what the answer to the question was, was we're lowering the price of the bike in order to democratize fitness. Right, yeah, they say that. We're lowering the price to democratize fitness. And you think that maybe that is the false statement because you think you have these allegations that the real reason was the excess inventory. Yes. My thought, you know, that I was suggesting is, you know, even if you are reducing the price to get rid of excess inventory, it might be that you think demand is stable. You just have to sell a bunch more inventory and you want to capture some more consumers. So maybe that still is an offensive price reduction in a way because you're trying to capture more consumers, even if the reason is because of excess inventory. Is that possible? I think it's possible, but I think that this brings me back to the pleading standard. And I think that if you look at our complaint, we've alleged sufficient facts that state a plausible claim for relief. And what the district court did was adopted its own interpretation of the facts. It interpreted its own interpretation of the facts to be benign and substituted his reasoning for what flows from the four corners of the complaint. So we can go back and forth about what this meant. But if you read our complaint, we explain what it meant to investors and to analysts. And I think that that's borne out by what happened in November and January of 2021 and 2024. If the market understood through revenue guidance and meeting revenue that somehow demand was not what they were representing it was because of the revenue guidance, then what happened in November? Well, you're saying because of the revenue guidance, but they completely, they consistently met the revenue guidance, right? Yes, it did meet the revenue guidance, but the market was still misled regarding demand, inventory, and the relationship between the two. And that's why I keep going back or I've gone back to what happened in November. No, why were they misled? I mean, we have these, you know, there are disclosures about the increases in inventory, right? Like they do say in different parts in the 10K and whatever that they've increased inventory, right? But your problem is really, I don't know, it seems to me maybe it's that instance where they say they reduced the price for a reason unrelated to inventory, but you have allegations that the price reduction was about inventory. Well, I don't think it's all about the price reduction. I think it's about representing to the market that inventory levels are increasing because we are purposefully trying to meet increased demand. And that's exactly what happened in the Blanford case. Well, it's not because in the Blanford case they tried to conceal the increased demand, right? And I don't think that makes a difference. I think that the statement in Blanford was we are at appropriate inventory levels. That's the statement. Those are the exact statements that we're attacking in this case. They were not at appropriate inventory levels because the demand was waning. So to the extent that inventory is building up in its warehouses, it's not purposefully. The demand wasn't exactly waning, right? It was waning from the COVID peaks of demand. But when they talk about year-over-year demand, the non-COVID period post-COVID was there was higher demand than the non-COVID pre-COVID period, right? I think that maybe where we're disconnecting is that we're attacking statements of inventory given what they know about demand. And we haven't talked, and I see that I'm way over my time, we haven't talked about the CWs who are all testifying that the inventory crisis was massive. Just like in Blanford, there's inventory up to the rafters, and they know that they don't have the demand commensurate with that inventory level. Again- Council, when you refer to demand, are you measuring that by revenue? I interpret demand, current demand, as the amount of people that want to buy the bike at that particular time. And are you, yes, I understand the amount of people, although your complaint doesn't use those numbers, but I'm wondering whether revenue is a proxy for demand, as you use the term demand. I think that the two terms are not coextensive. I think demand is incorporated in revenue, and I think that that's part of the failure of defendant's argument, is that- Well, you're the one that says demand was robust. So if you are not correlating it to revenue, but correlating it to numbers of people, does your complaint anywhere allege the number of people who bought bikes? Well, it's defendants that are arguing that demand was robust, not me. But I think, again, you have to- I thought your statement says demand was robust. No- Statement one. Oh, yes, we're criticizing- You see robust demand. We're criticizing that statement as false and misleading. Yes, and I'm trying to understand what demand is in that statement. You say, well, I thought it was revenue, but you're saying no, it's not necessarily revenue. I think that's a- Well, what is it? I think it's the number of customers at that particular time who are- All right, fine. Does your complaint anywhere allege the number of customers at that particular time? No, it doesn't, Your Honor, but again- So if demand is really a proxy for number of customers, but you don't allege the number of customers, how can the statement be false? Because we have 33 confidential witnesses telling us that demand has been dropping off since February 2021. Yes, but I'm trying to understand what demand means before we get to whether it dropped off. And you have answered me, no, it's not just revenue, it is the number of customers. But I don't see the number of customers anywhere in your complaint. I think at the end of the day, you have to look to what happened in September and admissions- What happened with respect to what? In November, with respect to what was disclosed about inventory levels, about sales- No, no, no, I'm not on inventory now. I'm on your statements about demand. You say demand was robust and still seeing very strong demand. Those are demand allegations. Right. And I'm trying to understand what they mean. I thought they meant revenue, but you're enlightening me that no, it's not just revenue, it's number of customers. Well, and it's sales. I mean, it's expected sales. Expected sales? That sounds very forward-looking. Your position would be the allegations in your complaint that show that the statements were false would be that you had these confidential witnesses saying that revenue was piling up and the company wasn't meeting its sales goals, right? Well, that revenue was piling up in a way that ultimately- And so you can infer from that that there was a drop-off of demand because they weren't meeting sales goals. They weren't meeting sales quotas. There's 31 confidential witnesses. But, of course, it might also be that they just were producing too many bites, right? Yeah, and then, again, I keep bringing you back to what happened in November, which is the same as what happened in Blanford. The inference of a huge revenue hit can be- It can have meaning regarding what happened previously in the class period. You had a $1 billion hit to revenues in November. You had a disclosure that Peloton had 500 days of bites on hand, 91% of which were unsold. Every executive was fired. Isn't that story that they were producing too many bites and actually there might have been robust demand, but they just had ramped up production way too high, and then eventually it hit a point at which they had to write down the cost of the excess inventory? It's not necessarily a taper. I mean, so it might be that some statements are misleading to the extent that they deny that there is excess inventory. It might not be a question of demand exactly. I completely agree with you that that's the story. I think they did reach a point when they- Right, but the consequences of that, I suppose- I mean, certainly there were consequences from it on November 4th when they announced the excess inventory and they revised the revenue guidance and there was a stock drop. Maybe August 26th when there was a price reduction that you allege was due to the excess inventory. But before that, how could we infer that there were consequences to the excess inventory or there was some full statement about demand? Because, again, we have confidential witnesses who say that everything that was announced in November of 2021 was happening- Was building up since maybe December 2020. Exactly. Certainly March and April or something like that. And then we have even two months later, we have these business insider stories and they're reporting that this company is in absolute shambles. All of the executives who are named defendants are fired and a new executive comes in and says, Holy moly, what is going on here? This is a cash crisis due to overwhelming inventory. I mean, that's what happens when you have too much inventory. Okay, I think we have that argument. We've reserved time for rebuttal, so we'll hear from you again. But let's turn to the appellee, Ms. Sherry. Thank you so much, Your Honors. Good morning, Your Honors. May I please support Melissa Arbacheri on behalf of Peloton? I want to talk about Blanford. I want to talk about the bike price. And I do also want to talk about the revenue guidance. But let me just start. Judge Chin, you asked the question, where are the inventory statements? And the answer you got was, let's talk about the February demand statements. The key here, and I agree the pleading standard is what matters, but the pleading standard requires particularity. And so while they tell a story about decreasing demand and increasing inventory, what's lacking are the particulars, the particular statements at a particular time and in a particular context. And so I want to look at all three of those things. What are the statements? Can I start with statements that I think maybe are more plausible? So we have the 10Q on November 4th, right, that makes the statement that says, if we fail to accurately forecast consumer demand, we may experience excess inventory levels. And inventory levels and excess of consumer demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would cause our gross margins to suffer. So the very same day, right, the company announces that 91% of its inventory was unsold and its earnings guidance had to be reduced by a billion dollars. So at that point, at least, by November 4th, wasn't it false to talk about that as a hypothetical when, in fact, the excess inventory and the write-downs were occurring? No, no. So two points on that. That's the risk disclosure in November. One is context matters. So what is being said in November? And, in fact, my friend on the other side spent a lot of time talking about this. November, the statement is we're reducing our revenue guidance. Why? Because we saw a decrease in demand that we were not expecting to see in September and October. We saw the web traffic slowing down. We didn't see the pickup in showrooms that we expected to see. So we're reducing our fiscal year 22 revenue guidance. Well, that's the announcement, but then the Form 10-Q talks about that as a hypothetical risk, right? No. So the risk that it talks about is about the financial. It says if we fail to accurately forecast, we may experience excess inventory. And the allegation is that they had already failed to accurately forecast consumer demand, and they were already experiencing excess inventory levels. Yes, but that's what they were telling the market at the same time. So no reasonable investor is going to look at the total mix of information, which has to be risk disclosure. It's because you made a separate announcement the same day about the excess inventory, right? Is that what you're saying? And not about, just to be clear, not about excess inventory, but about reduced demand in September and October. And so what they said is we saw a decrease in our demand profile. We're reducing the revenue guidance. And what's being warned about in that risk disclosure is an impact on operating results. And so the part that you're on are red. So if you had made the separate announcement the same day about the excess inventory and the reduced demand, then the Form 10-Q might have been misleading. But you're saying because you announced the same facts to the market the same day, then it's all in the mix of information? I still don't think so, because I think the risk that's actually being warned of there is the impact on operating results. And it gets specific about what that risk is. It talks about write-downs and write-offs and the like. And that did not happen in November. And, in fact, the complaint does not allege that it ever happened. And so I do think that's important. The other key point, I mean, they point to November as what they call – Does that not mean that there's going to be – Again, I just want to put a fine point on it. The disclosure was not about excess inventory. The disclosure in November was that demand had slowed down web traffic-wise and also as far as the showrooms. And, importantly, this is November 4th. This is in advance of the holiday season. But the disclosure that 91% of the inventory was unsold is not about excess inventory? I would dispute that math. But the point is it was disclosed. It is very hard to have allegations of fraud based on information. No, I get it. I get that point, which is why I'll move on to something else. But just to clarify this, if you did not have that separate announcement about the reduced demand, let's say all you did was release the 10-Q that talked about a hypothetical risk. Would that have been misleading if you did not disclose what you separately disclosed about the reduction in demand? I don't think so because of what the risk disclosure is focused on, but I don't think we have to go there. And the reason why is what? Because of the sale of excess inventory at discounted prices, and you're just saying that didn't happen. There was no – and this goes to the Blanford point. This is not like Blanford at all. We don't have allegations of that, but, in fact, they do have allegations that the price reduction on August 26, 2021, was because of excess inventory, right? CW1, who is a former corporate officer, says that's the reason because we had all of this excess inventory and we had to reduce the price, but the company is saying publicly it's about democratization of fitness. So let me go right to the price reduction. Three points on that. One, procedural. Two, substantive. Procedurally, they didn't actually make an argument, a falsity argument, with respect to bike price in the district court. You can look at their opposition to the second motion to dismiss. They were not talking about the bike – the language is in there, but they make no falsity argument. Based on that, the district court didn't address it. If you look at their opening brief, they quote the language. It's not in their falsity section. It's only in their forward-looking section. That's the procedural point. Substantively, you look at what actually is being asked, and I think Your Honor made the two points I was going to make, which is what does offensive or defensive really mean in that context? It's, at best, ambiguous. And, secondly, the question is not about inventory. The question is about demand. They're talking about the light Q1 guidance. So in August, they're giving guidance. I get that, and as you said, I made that point just now. But I was asking the other side the question.  So if, in fact, the question is is it offensive or defensive, and the complaint plausibly alleges the real reason is because they have this excess inventory and that they're in a difficult position, to then make a public statement that says, well, it's offensive. We just want to democratize fitness. We're just going after more of the market. Doesn't that become misleading if the real reason is that the company is in a difficult position because of excess inventory? It doesn't, both because of what the statement says. But you said there's allegations in the complaint that the real reason was excess inventory. You pointed to literally the only allegation in the complaint. On that, CW1 has about half a sentence in paragraph 31. But why does that make it plausible if CW1 is, in fact, a corporate officer who knows about the internal operations? He is listed as a senior director of supply chain management. There's no allegations as to how he knows this information, who told him that. Let me ask you something here. In terms of the pleading standards and the application of the pleading standards, you just referred to the one CW. The district court did seem to discount the effectiveness of the CW's allegations. They're from low-level CWs. On whether they're forward-looking statements, the district court said that they are not. The district court at one point says the allegedly false statements were true. At one point, the district court says Peloton has sufficiently alleged that the inventory was not excessive. Is the district court properly applying the pleading standards with those kinds of conclusions? The district court is, and I think looking at this de novo, actually- Peloton has sufficiently alleged? So, obviously, that is not the correct way to frame it, and whether it's a typo or otherwise. The point here is it's de novo review, so I'm happy to talk about the pleading standards, and I think we should, because I think the key here is we want to talk about the CWs. There just isn't a contradiction. Remember what Peloton is telling the market during the same time period. So taking the CWs on their face for what they say, at some point in spring and summer 2021, and I do want to go back to February. Sometime in spring and summer 2021, demand, you know, they're not meeting their sales quotas, and they're seeing a lot of inventory in warehouses. But the key here is that's the exact same time that Peloton is telling the market this is what we're doing. They're saying we're returning to seasonal sale trends, which means what? In spring and summer, you're going to see fewer sales. You're going to see less demand. Our revenue guidance shows a drop in quarter-to-quarter. It's saying things like we are seeing incredibly strong demand. It's absolutely not a softening. So that's in February. I want to go back to February, because I think the answer on the February statements is a little bit different than some of the later statements. The later statements is you're saying the company is acknowledging that COVID is anomalous, and when they talk about increased demand, they're talking about year-over-year demand, and that was accurate. No, anomalous, that they're seasonal trends, that they're returning to seasonal trends, meaning that spring and summer is supposed to show fewer sales. The revenue guidance reflects that. They're acknowledging that it's decreased demand compared to the prior quarter, but it's increased demand compared to the prior year in the same period. Exactly, and again, better exceeded every time. And they don't want to talk about revenue guidance, and the question was asked as to whether that's a proxy for demand. Not only did Peloton reference revenue guidance in talking about demand and say that the demand is reflected in revenue guidance. If you look at paragraph 118 of their complaint, the salesforce stuff that they like to talk about that shows the sales data, they say that Peloton used that to make this revenue guidance. And so the problem is you can't say the revenue guidance isn't false. You can't say the revenue guidance, you know, doesn't show strong or robust demand, and then at the same time say that it was wrong to call it strong or robust. And just to go back to February. Excuse me, counsel. When your statements say this does demand being robust or strong, how are you measuring demand? As we told the market, it's in reference to our, it's reflected in the revenue guidance. And so the revenue guidance reflects the demand that's being seen. Demand, is demand a synonym for revenue here in your statement? It's a proxy. I think it's fair to call it a proxy, and that's what the market was being told. That's what they allege in their complaint, and that's really the message. So when you say, so then if I read it revenue was robust or revenue, compared to what? That's exactly the question. Compared to what? Well, that's why I asked it. So what's exactly the answer? So the question is what do the allegations say about compared to what? They just talk about sales in the abstract. Compared to what? Compared to the prior quarter. We said the seasonal trends are coming back. Compared to the prior year, there is year over year growth being shown. And when are these demand statements being made? And I do think this is really, really critical. The ones they rely on the most, the February statements, not only are there no allegations in the complaint sufficient to support that demand had slowed at that time, if you look at paragraph 110 of the complaint, and this is on page 206 of the joint appendix, this is their language. For most of calendar year 2020 and the very early months of 2021, the COVID pandemic was a boon for Peloton. They were seeing unprecedented demand. So the early months of 2021, January, February at least, their own allegations say they were seeing a boon, they were seeing unprecedented demand. And that's why I keep going back to the statements and to the specific time the statements were made. Well, that's interesting. I mean, it does say there the very early months of 2021, but, you know, CW2 thinks that the company was missing sales goals starting as early as December 2020. So you're saying that's just a contradiction in the complaint? It's a contradiction in the complaint. It contradicts what other CWs said. And I think you can say one or two things about those contradictions. Either it's not good enough at a motion to dismiss, or you have one CW in one location who has, you know, a limited view of what's going on. So it makes it not plausible. I'm sorry? So you're saying that would make it implausible if you have some people saying there was a reduction in demand and some people saying there was not. Either implausible or what the court said in Blanford is when you're looking at CW statements, they have to be probable that they're in a position to possess the information. And the information that matters is company-wide information. It's not what's going on in one showroom. It's not what's going on in inside sales. They have nothing about web traffic. So that's why I was asking you earlier about the price reduction, and you said that you were going to complete your answer to that. I guess the question is you said, well, that's just one person, even though it's the director of supply chain management or whatever the position is. Is your position, well, it's not plausible to say that that was the reason for the price reduction, and that's why the statement is not false? I would more say it's not particularized, right? There need to be particularized allegations. And so when you're looking at CW statements, you can have confidential witnesses, of course, but you need to have sufficiently alleged facts to show that they're in a position. The particularization is you have to identify the statement that's false and the circumstances that show the falsity. And so if the statement is this is an offensive price reduction, we're doing it only to democratize fitness, and the real reason is because of excess inventory, and the complaint alleges not only that there's a corporate officer who says that that's the real reason, but also a bunch of witnesses who say that there was inventory piling up at the warehouses, why isn't that a particularized allegation? I don't think so. I think it's too conclusory without additional factual allegations. I also would point out that he doesn't allege. So do you agree in principle that if, in fact, they had plausibly alleged that the real reason for the price reduction was the excess inventory, then the statement would be false? Perhaps, but I would then go to scienter, so I think this is important. Well, yes, I understand, but the district court didn't address the scienter question. That's true because the district court dismissed it on falsity, but if you look at that allegation, not only is it conclusory, not only is it lacking in facts, and not only is it forfeited here, but it doesn't link it up to Foley at all. So Foley is the one who made the statement, and that half a sentence in paragraph 31 doesn't say Foley knew anything or thought this was the purpose or agreed with the purpose, and if you look at the other CW1 allegations. So that's a scienter argument that maybe Foley really did think it was about democratization of fitness, but putting that aside, just about the falsity of the statement, if you agree that it would have been a false statement if the complaint plausibly alleged that the real reason was the excess inventory, why isn't it plausible if I have a corporate officer saying that's the real reason and I have a bunch of confidential witnesses saying inventory was piling up? So it's plausible that there was excess inventory, and there's somebody who's a corporate insider saying that's the reason we reduced the price. So I think just to be clear on my answer, I think in addition to having more specifics from CW1 or another confidential witness in a position to know, you'd also have to have more specifics in the statement that's being made, because, again, the question being asked is not about inventory. The answer is not about inventory. It's about increasing demand, and actually if you look at Lynch's statement, which follows up, it continues on what Foley is talking about and says we ran these price point analyses and we've decided that this is a good price point in order to increase the demand and to bring more people under the tent. So I think when you look at it holistically, it doesn't get there. I realize my time is up. That's okay, but it doesn't get there because they're not actually denying that the reason was because of excess inventory. They're just denying the reason is not because of declining demand, and there isn't plausible allegations that demand was declining even if inventory was increasing. I think so, although I don't even know if I would say – I'm not sure it's even showing that they're disagreeing with declining demand, again, because of how vague the question was and what offensive or defensive means in that particular context. So I think if you pair up and, you know, you have all the things together, I think you pair up the forfeiture. Offensive or defensive has to at least mean, because the questioner is talking about demand, it has to at least mean is this a response to declining demand or is this an effort to go out and reach new consumers, right? Right, and the answer is we are trying to increase demand. So, you know, yes, I think you can quibble about what offensive or defensive means. In terms of the particularized allegations, what are the kinds of allegations that would make it plausible that the real reason for the price reduction was excess inventory? I think these don't satisfy that standard. So I think if you had a different statement, so let's say the question was, we see you're reducing bite price, we're looking at your inventory balance sheet and we see as you've disclosed quarter to quarter. I'm asking about what would make the allegation that that's the real reason plausible. Well, I think it would both be that you need a clearer statement. No, no, you need both. So let's assume you have a very clear statement saying the opposite. I think you would need allegations in the complaint, CWs or otherwise, that, number one, are in a position to know this information, to have been involved in coming up with the bite price or heard about the reasons why there was a bite price reduction, and some specifics about timing, who was in the room, who discusses where the reports, just something more specific than what they have here. And I don't think it is surprising that we're spending this much time talking about this statement because I think their theory on inventory has always been a theory in search of a statement. And they didn't raise this one, again, below. They didn't really raise it in the opening brief. August 26, Form 10-K, right, does talk about inventory because it has the hypothetical statement about what would happen if there was excess inventory, right? Are you talking about the risk disclosure that was in August as well? Yes. So that is about inventory, and it says if we have excess inventory, we might have to reduce the price. So there, that's not the lack of a definite statement, but that would hinge on whether the allegations were plausible that the real reason was the excess inventory. I don't think so because of what that risk disclosure says. Again, it's warning about the impact it could have on operating results, and so it's not talking about making a decision on what the price per byte should be. It's talking about whether there's going to be a need for write-offs or write-downs or mark-downs, and I think that's actually a good. But isn't that price reduction a mark-down? No, it's not. What it's talking about is an accounting kind of. So the sale of excess inventory discounted prices. Oh, you're saying the wholesale sales, that that's what it's talking about? I'm saying it's talking about. The price reduction of retail sales? I'm talking about like in gap terms when you have an inventory problem and you reassess your inventory and you know you're not going to be able to sell it at or above cost. You have to take a write-down. You have to do a write-off. You have to do discounting. You have to do exactly what was going on in Blanford, not in Blanford, rather in Novak, where the Ann Taylor case where they were talking about having a mark-down policy and not following their mark-down policy and telling the market otherwise with respect to their inventory that was on hand. I think Blanford is a good example and good contrast when it comes to inventory for three reasons. One is the absence of express statements here in Blanford. There were actual statements specifically about appropriate levels of inventory. You can go through the limited number of statements that are challenged here today, and they're not about that. We've talked about the risk disclosure and we've talked about the bike price. Secondly, active concealment. What was going on in Blanford, as alleged, was that they were literally having phony and fake shipments for QVC and otherwise. They were loading things on the truck at the dock. You disclosed the increased inventory, but just the allegation is that you didn't give the real, or I don't know, you didn't give the real reason for price reductions or something like that. I mean, I don't know either, and that's the problem. Because not only was the amount of inventory disclosed quarter after quarter, but the plan with respect to inventory was disclosed. If you look at the public filings and you look at the earnings report, what they are telling the market is we are purposely building inventory. We're doing it to get rid of the order to delivery time issue we had, and then we're looking to holiday season 2021. And just to take a step back. But by November 4th, 2021, there was a problem with the inventory, right? No. By November 4th, 2021, what they are telling the market is we're seeing slower demand in September and October. But remember, it's November 4th. Before Black Friday, before Cyber Monday, we still think we're going to have the best holiday season ever. And so it's only, they like to talk about the January articles. That's after the holiday. And taking a step back, that's what's going on here. I mean, this is a classic example. Don't you reduce the earnings guidance on November 4th? They reduce the revenue guidance for fiscal year 2022 after seeing a slowdown in September and October. But, again, going into the holiday season. And so when you talk about having too much inventory on hand, the whole purpose, and they told the market this was no secret, was we want to have more inventory than demand because we don't want to have the same problem we had in 2020 where we had all this demand, we didn't have enough inventory, and our order to delivery times exploded. We don't want to do that again in 2021. We're going to have more inventory on hand than demand. We're going to get ready for what we think will be the best holiday season ever, and we're not going to have the same problem. You came forward with this idea that you had this increased inventory and that you had to shift because of the interaction between the inventory and the demand. And they're saying, well, you had inventory that outstripped demand. And you're saying, no, we did it on purpose, and we're doing what we always intended. I mean, why isn't that a fact question? Because it's based on, you know, it's not just me saying it. It's what they're telling the market. And it goes back to the total mix of information and whether a reasonable investor is going to be misled. This reasonable investor is getting all of this information. They're getting the actual quantification of inventory. They're getting statements saying we're building inventory. In fact, CW1, who they rely on so much, says they're telling us we need to have 30% more inventory on hand than demand. That's paragraph 29 of the second amended complaint. And so the theory just doesn't match up. I mean, they want to say there's a contradiction between what the CW saw and were saying and what the statements were, but the statements were exactly that. It was saying in the spring and summer, you're going to see less demand. You're going to see fewer sales. We're returning to seasonal trends. It said spring and summer, we're building inventory. We've expanded our manufacturing capabilities, and they say this in February, more than demand, and you're going to see that accelerate in the coming months. So building inventory, revenue going down, exactly what they told the market. I think we have that argument. Excuse me. Counsel, do you understand the complaint to allege insider trading? I understand the complaint in count three to allege insider trading. I don't understand them to have pressed that on appeal. They don't. The insider trading claims in the complaint are, count three at least, is against the non-speaker defendants, and they didn't press that in their opening brief. Did the district court rule on that allegation? The district court, I think, ruled, if I remember correctly, on 20-A, that version of the insider trading claim, and on appeal. They refer to the stock sales, but they refer to it only in the context of the Scienter arguments, and I'm happy to address the stock sales if you'd like me to, but they don't press it on appeal. I want to know the stat. Are you contending that that claim has been forfeited for not being adequately pursued on appeal? I am. Does your brief say that? It does. We say in the brief, I think they forfeited a couple of different things, but one of the ones we point to is the insider trading claims and any claims against the non-speaker defendants. On appeal, they just pursued the sort of straight-up 10-B claim, and the only statements that they're pursuing on appeal were made either by Foley or Woodworth. So the other defendants, as we say, I think it's in the beginning of our, I want to say either summary of argument or argument section, we say the only claims that are at issue are the 10-B claim. The only statements that are at issue are the eight we talk about. And lastly, when your statements say the demand was either robust or strong, are you referring to comparing it to peak of COVID or pre-COVID? Well, the ones in February, I guess a little bit of both. The ones in February, we say strong, and the revenue guidance there shows an increase from the prior quarter, so during COVID and there was a year-over-year increase as well. When you go a little bit later in the period and you look at Statement 10, for example, that was a statement by Woodworth during the JPM conference, that one is expressly comparing it to two years prior to 2019. So it's both? You have to look at each statement. It's a little bit of both. A little bit of both. Okay. Okay. Thank you very much, Ms. Sherry. We'll turn back to Ms. Fish on rebuttal. I'll try and go real fast in my one minute. What I heard from my colleague was a rather friend. Same mistake, but we can be colleagues. A lot of explanation of the increase in inventory. That is exactly what defendants and the court are not allowed to do on a motion to dismiss. Replace the well-pled allegations of the complaint which state a plausible claim with their self-serving explanations for why inventory was increasing. But if the explanation is something that the company communicated to the public, it would render the statements not misleading, right? So the question is whether they're providing an explanation, you know, after the fact to just challenge the allegations Or they're explaining the full context of the statements that the company made. I don't believe that they were telling the market that inventory was increasing. It was truthful what they were telling the inventory, that inventory was increasing in response to increased demand. When we have CWs who are saying just the opposite. My friend also noted that the November 2021 announcement did not encompass inventory. The November 2021 announcement revealed that inventory had increased 35% from June 30th, 2021 to November. And that 91% of Peloton's inventory was unsold finished product. So certainly that November announcement did, in fact, encompass inventory. But I think the argument was that they weren't saying that the inventory was a problem that required write-downs because they were going into the holiday season. So what about that? Again, their explanation for why inventory is increasing, because we're going into the holiday season, was false. There were 31 CWs saying that inventory was literally piling up in warehouses and there was no concomitant demand. And this leads me to the comment that I was asked a question about inventory and talked about demand. I would direct your honors. But why is it possible what Ms. Sherry just said, that the company had a strategy of having demand that outstrips inventory because they didn't want to be in a position that they were in during COVID where they couldn't meet the demand. And so if, in fact, they're saying, you know, we're going to have inventory that's greater than demand going forward, if they're disclosing the increases in inventory and they're talking about increases in demand only in terms of year-over-year demand and that's accurate, then what is misleading to the public? I think that that encapsulates exactly what we're alleging was misrepresented to the market. I don't think that that's what they were doing. And their benign explanation for what they were doing does not supplant the well-planned allegations of the complaint supported by CWs. And so you're saying that your allegations are that the increased demand or the increased inventory was because they were seeing decreased demand but kept their head in the sand about it and just kept producing bikes. No, they actually stopped producing bikes. Well, eventually. Yeah, I mean, there are allegations in the complaint that they import data show that they had stopped importing bikes in mid-2021. And then when McCarthy comes in, these business insider stories reveal that there had been a complete stoppage of production, I believe, in December of 2021. And then later in January, there was even a bigger halt in production. But you're saying that they knew that they should have done that earlier. I think that what likely happened is that during COVID, they overproduced bikes. And I understand that COVID is a difficult time. And I understand that COVID darling cases are difficult. But at a certain point when they realized that they had excess inventory, they had to disclose that to their customers. They couldn't just state, oh, no, we did this on purpose. Because that's not what's happening. So, well, that changes the case. Are you saying it's a failure to disclose rather than a making of a false statement? No, I think that they were false statements made. And that leads me to… You just said they should have disclosed. That sounds like it's an omission. No, I think that it rendered their statements false by failing to disclose. And while I'm asking, do you agree that the insider trading claim has been forfeited? Well, we certainly have a lot of insider trading allegations that go to Scienter. No, no, no, that's not the question. No, I understand. I understand your question. Do you agree it's been forfeited on appeal? No, we do not believe that it's been forfeited on appeal. And where did you raise it on appeal? Judge Carter… No, no, no. Where did you raise it on appeal? I'm trying to lay a foundation to answer your question, Judge Newman. Judge Carter did, in fact, dismiss the 20A claims for failure to find a predicate violation. We cited in our reply brief, I believe it's in a footnote, footnote 19, plaintiffs have not waived any argument with respect to the insider trading defendants. The plaintiff may state a 20A claim without pleading a 10B claim so long as there are factual allegations supporting a reasonable inference of a 10B violation. Your brief, in a footnote to the reply brief, simply says you haven't waived it. But where in your main brief or reply brief do you advance the insider trading claim? Page 58 of our opening brief, Your Honor, the SAC adequately alleges a Section 28 claim. With respect to insider trading? Yes, sir. Or a controller? 20 capital A, Your Honor. Insider trading? Yes. Okay. You want more or no? No, that's fine. Thank you very much, Ms. Fish. I just wanted to just point out that, you know, it's been stated that we don't have any false statements about inventory. Would you direct your attention to page 11 of our opening brief? It's four statements, including a statement in May 2021 that was a specific question about increases in inventory. And the defendant... I've read the brief, and I think I, you know... You know what these statements are. So thank you very much, Ms. Fish. The case is submitted. And as I explained, we're going to take a brief adjournment and then reconvene with a slightly different panel to hear the rest of the counsel.